# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 13, 2009 Session

## STATE OF TENNESSEE v. DANNY RAY ANDERSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1743      Steve R. Dozier, Judge**

---

**No. M2008-01740-CCA-R3-CD - Filed August 10, 2009**

---

The defendant, Danny Ray Anderson, pled guilty on January 31, 2008, to two counts of felony murder and was sentenced to two concurrent sentences of life without parole. On February 5, 2008, he filed a motion to withdraw his pleas of guilty based upon his claims that the pleas were the result of fear and misunderstanding and were not knowingly, understandingly, or voluntarily entered. After an evidentiary hearing, the trial court denied the motion. Following our review, we affirm the order of the trial court denying the motion to withdraw the pleas of guilty.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Wendy S. Tucker, Nashville, Tennessee, for the appellant, Danny Ray Anderson.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin N. Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant and a co-defendant, Christina Delarosa Sanchez, were indicted on June 30, 2006, for two counts of first degree premeditated murder, two counts of felony murder, and two counts of attempted especially aggravated kidnapping. Sanchez was also indicted for one count of theft over $1000. Subsequently, the State filed notice that the death penalty would be sought against the defendant. On January 31, 2008, the day before potential jurors were to appear, the defendant pled guilty to two counts of felony murder, as we have stated, with the other charges being dismissed. Five days later, the defendant then filed a motion to withdraw his pleas of guilty and to substitute counsel. The latter motion was granted by the trial court, which conducted an evidentiary

hearing on May 9, 2008. By lengthy written order, the court denied the motion to withdraw on June 26, 2008. The defendant then timely appealed.

At the submission hearing, the State set out the facts which would have been proven at trial:

Had this case gone to trial, the State's proof would've shown that Defendant Sanchez and Defendant Anderson are associated, because Anderson has a child with Sanchez's daughter.

Defendant Sanchez was in a relationship with a man and, at some point in that relationship, she led him to believe that she was pregnant with his child. The man she was involved with then was placed into custody, serving a sentence in Rutherford County.

As his sentence was due to expire, Defendant Sanchez became concerned that their relationship would end, unless she produced a baby to pass of[f] as theirs.

She then started visiting the WIC Office, in hopes of finding an Hispanic woman who had an infant child. It was at the WIC Office that she encountered Hilda Grizelda Gutierrez.

Ms. Gutierrez was the mother of Michelle Halla (phonetic) Aguilar, three years old, and Michael Aguilar, an infant.

Defendant Sanchez approached Ms. Gutierrez and offered to assist her in obtaining papers that would make it possible for her to travel in and out of the United States, so that she could go out of the country to visit family.

Believing that Sanchez would help her with this, she gave Sanchez her address. Sanchez then enlisted Defendant Anderson to assist her in going to the home of Ms. Gutierrez and kidnapping her baby.

On December second, two-thousand-five, Ms. Gutierrez was preparing to take Michael, her infant son, to a doctor's appointment. Defendant Sanchez and Defendant Anderson came to her door, and Ms. Gutierrez let them in.

During this meeting Defendants Sanchez and Anderson acted in concert and killed both Michelle Aguilar and Hilda Gutierrez. Ms. Gutierrez was stabbed and strangled to death. Michelle Aguilar was also stabbed and smothered to death.

After Ms. Hilda Gutierrez and Michelle Aguilar were killed, but before Defendants Sanchez and Anderson left, Ms. Gutierrez's husband, Rudy Aguilar, had gotten off of work and arrived back at the home.

He tried to open the door, but it was locked. Mr. Aguilar knocked on the door, and Defendant Sanchez said, "Just a minute." Moments later Defendants Sanchez and Anderson hurriedly left the apartment, walking out past Mr. Aguilar, without Michael, who was not injured during these events.

Mr. Aguilar discovered that his wife and child had been murdered and ran to a friend's apartment, who called the police.

Ms. Gutierrez's friend, who accompanied her to the WIC Office, spoke with Mr. Aguilar; and he gave a description to her about what the Defendants looked like.

Based on that description, she . . . recalled Ms. Gutierrez encountering Defendant Sanchez at the WIC Office.

She looked through photographs at the Police Department and identified Defendant Sanchez. A photo lineup was then prepared, and Mr. Aguilar was able to pick her out of the lineup.

When Defendants Anderson and Sanchez were questioned by detectives, they both admitted to involvement in . . . the attempted kidnapping and the murders. Each implicated the other, as well. The truck that they left in was later recovered in Montana.

All of this occurred here in Davidson County. And, based on these facts, the State recommends the previously-announced sentence.

Following this recitation of the facts, the trial court questioned the defendant, finding there was a factual basis for the pleas and that they were knowingly and voluntarily entered:

THE COURT: All right. Mr. Anderson, were you able to hear the statement made by the District Attorney?

THE DEFENDANT: Yes, sir.

THE COURT: And was that statement true and correct?

THE DEFENDANT: Yes, sir.

THE COURT: What are your pleas, in Counts Three and Four, where you're charged with first-degree felony murder, guilty or not guilty?

THE DEFENDANT: Guilty.

-3-

THE COURT: The Court finds a factual basis for the plea, that it is knowingly and voluntarily entered; in each count will impose a life sentence without the possibility of parole, to run concurrent with each other; and the other counts, . . . One, Two, Five and Six, will be dismissed.[1]

At the hearing on the defendant's motion to withdraw his pleas, one of the attorneys appointed to represent the defendant at trial testified that, because of the setting of another case, he was not present when the defendant entered his pleas of guilty. He said that, earlier, he had left voice mail messages for representatives of the State that the defendant "was now interested in entering a plea of guilty" and asked that they call him. Later, he advised one of the prosecutors that the defendant wished to plead guilty. Several days later, counsel received a voice mail message from the defendant, saying that "he didn't wanna [sic] go to court and he had changed his mind about what he was going to do." Counsel later spoke by telephone with the attorney who had appeared in court with the defendant and learned that the defendant had entered pleas of guilty:

And I was satisfied, at the end of that conversation, that [the defendant] obviously was moving from one side to the other, over the couple of days, of what he wanted to do and that he had reached a decision, after leaving the voice mail, that he wanted to proceed with the plea; and really thought nothing else about the voice mail that he had left[] until that weekend when I received a rather lengthy e-mail from his mother, in which she was complaining that he had been allowed to enter this plea and how it had been something that he really didn't want to do, felt pressured into it[.]

Both counsel met with the defendant, who told them that he wished to withdraw his pleas of guilty:

He was adamant at that point that he wanted to take all steps to withdraw his plea; explained to us how he felt confused and pressured into doing this; that we should know, given his historical position – and certainly he didn't use that term – but we should know, given what had transpired up to that point, that he never really wanted to enter a plea.

So, we discussed the . . . basis that we might assert to the Court for withdrawing the plea; discussed with him what the standard (sic), before the Court would give consideration for allowing the plea to be withdrawn; tried to encourage him to forego this proceeding.

And he was adamant that he wanted to pursue it. And we then proceeded to prepare the paperwork.

---

[1] This exchange came at the end of the submission hearing, after the court had questioned the defendant at length regarding the pleas of guilty.

-4-

Trial counsel stated that he did not attempt to push the defendant into pleading guilty:

A       I never threatened him or forced him to do it, but I was very persistent with him in my opinion that he would be making a colossal and potentially fatal mistake, if he tried to take this case to trial.

Q       And in your opinion, based on your review of the State's case and the evidence against [the defendant], did you feel like there was a high probability of conviction for two counts of felony murder[?]

A       Yes.

Q       – and the other counts he was charged with?

A       Yes.

Q       And, as far as the . . . mitigation that he had, as far as the sentencing phase and the death penalty, did you feel like there was also a good probability that he would receive the death penalty from a jury?

A       Yes.

Counsel was asked whether he told the defendant that he could enter pleas of guilty and, later, have the pleas set aside by claiming that trial counsel had been ineffective:

Q       Did you ever advise [the defendant] that, even though he pled guilty, he could always allege ineffective assistance of counsel and get the plea set aside?

A       Did we advise him of that?  I –

Q       Yes.

A       – don't think so.

Q       Your motion says, "The [d]efendant also believed erroneously that, even after entering guilty pleas, he could claim ineffective assistance of counsel and have his convictions set aside."

A       Right.  That's what he told us, when we met with him and discussed a withdrawal of the plea.  As we were trying to go over with him the thought process that he had gone through, leading up to his individual decision to enter the plea, it was in the context of, "Danny, here we are on Monday or Tuesday.  You did this on Thursday.  I wasn't there; so, tell us what you were thinking, when you were in court

on Thursday saying that, "I'm guilty and I want to voluntarily waive all of my rights."

And then he, as I recall, stated that one of the matters that he considered in the decision was his ability to later allege ineffective assistance [o]f counsel.

THE COURT: (To the Witness) But you don't know where that information came (sic)[?]

THE WITNESS: Well, I know it didn't come from me. And beyond that I'm not sure that I discussed with him where he got that information. But I do recall, in that conversation on Monday or Tuesday, that he was now reconsidering whether he could advance a defense of ineffective assistance of counsel, in light of his plea.

Counsel told of his prior criminal trial experience:

Public Defender's Office from 'seventy-seven until 'eighty-six; tried many, many cases while in that office. Probably the majority of my trial experience was in the Public Defender's Office.

Since that time I've been in private practice, doing both defense of criminal cases as well as civil practice.

Q    And . . . the reason I was asking that, I mean, is it unusual from your perspective for defendants to change their mind, be convinced now's the time to plea[d], when the jury's waiting out in the hall the morning of trial or scheduled to come in to report the next day?

A    No, it's – you know – I hate to use the word "buyer's remorse" – but you see it often, after the reality of the plea has sunk in to the individual, that they start looking more favorably upon the options they had before they entered the plea and things get a little bit out of focus.

I think what was significant . . . in [the defendant's] case was that . . . the panel was coming in on Friday, the first, to fill out questionnaires and to go through the preliminary acceptance or disqualification for obvious conflicts of being able to serve.

The concern that I had . . . is that, as we moved closer and closer to the nineteenth, which was the trial date, it was going to get harder and harder to have any discussions about the possibility of settlements; so that, if it was going to take place, it needed to take place sooner rather than later, if we were gonna [sic] be able to make anything happen favorable for [the defendant].

The trial court questioned co-counsel who represented the defendant at trial regarding the defendant's claims that the court's denying his request for additional funding had been a factor in his decision to plead guilty:

THE COURT: Le[t] me ask this, before we go any further, and maybe these orders and requests need to be made exhibits; I don't know – but, I mean, you're right. I mean, the requests were made; but the Court in its order said, "The Court finds that, absent an explanation as to these duplicated requests."

There . . . was a whole laundry list of . . . twenty-seven witnesses listed in prior requests that had been approved; and then the new request, it was those same twenty-seven witnesses and same eight other tasks that were listed. They were duplicated; they were the same.

So, all I put in here was, "The Court finds that, absent an explanation as to the duplicated request," in other words, tell me why they're doing the same things over again, that was footnoted, that you could explain that and I would consider it.

Is that not accurate?

THE WITNESS: . . . I think it is. I think the . . . footnote referred to it as . . . being duplicitous, and I think the Court meant duplicative. But – I hope the Court meant duplicative . . . I was certainly going to pursue that.

And I don't know what the time frame was on that.

THE COURT: Well, this order was entered January twenty-eighth.

THE WITNESS: Yeah. And, so, it was . . . I thought it was fairly close.

THE COURT: So, it's not like I denied something in October and then I never hear from you again.

THE WITNESS: Absolutely, Judge. And . . . should the case had gone forward, I certainly was going to pursue that with the Court. Of course, I didn't know . . . what the result of that would be; but I was certainly gonna [sic] pursue that with the Court.

Counsel testified that he reviewed the plea agreement with the defendant:

Q       The fact that [the defendant] alleges that he is not well-educated, . . . was that ever a problem, when you met with him and discussed his case and ultimately when you discussed the plea papers with him?

-7-

Did – was that ever a problem?  Did he ever say, "I can't read," or, "I don't know what you're talking about"?

A    No.

Q    And do you recall, when you went over the plea papers with [the defendant], if you read them to him or read together, or how exactly that was done?

A    I went through the plea papers, like I do with every defendant I represented. I read it word-for-word, and they sign each line as I go through it.

Q    Okay.  And, I believe, when [defense counsel] was asking you about that, about any questions or concerns [the defendant] may've had about the plea papers, I believe your comment was, "The only thing he said, 'Defenses, none.'"

A    That's the only thing I remember.  He may've said something else that I don't remember, but that's what sticks out in my mind.

Counsel was questioned about the loss of a taped witness statement by an investigator for the defendant:

Q    What . . . was your understanding of the nature of the tape that was lost? What was that supposed to be, that would help –

A    My –

Q    – [the defendant]?

A    – my understanding – and I never heard the tape – my understanding was that there was a tape-recording of . . . Alex – and I don't know his last name, but it was the boyfriend of Christina's – a conversation between Christina and Alex, I believe, where Christina tells Alex – and, again, I didn't hear this tape – Christina tells Alex that she threatened [the defendant] with the death of Mylene and Alexis, if he did not help her.

Q    And Mylene, again, would be Christina Sanchez's daughter[?]

A    That's correct.

Q    Alexis being her granddaughter[?]

A    Correct.

Q      And the person who you were unable to locate would've been Ms. Sanchez's boyfriend at the time –

A      Yes.

Q      – who was in jail?

A      Yes.

Q      And, even if you had this tape-recording, in your opinion as an attorney, is that something that could have been admitted at a trial in this case?

A      I . . . don't necessarily see how it would be admitted.  And, even if it was admitted, it's my opinion that the defense of duress would not apply in this case.

Q      And, even if . . . let's just assume, perhaps, you thought, maybe, "I could go there, this duress defense," would you agree with me . . . that you would have to have Christina Sanchez to testify and say, "I threatened [the defendant] to kill my daughter and my granddaughter, if he didn't do what I wanted him to do"?

A      I think that's right.

Q      Otherwise, it would just be inadmissible hearsay.

A      I think that's right.

Counsel explained, in further detail, that "Alex," the witness in question, could not be located and had returned to Mexico:

THE WITNESS:  He was in . . . jail, . . . when the offense occurred.  At some point he was released from jail – I think he was in jail in Murfreesboro – he was released from jail and then I – I . . . .

At one point we thought he was deceased.  We later found out he was in Mexico, but we had no way of finding him in Mexico.

THE COURT:  Whether I'd given you fifty grand.

THE WITNESS:  I don't see how we could've found him – I forget his name, but it's a common name in Mexico, and I don't know how –

THE COURT:  And who had the tape you're speaking of?

THE WITNESS:  The tape was given to an employee of Inquisitor, and they were unable to find the tape.

. . . .

Q      (By [the prosecutor])  Do you know who would have given the tape to Inquisitor?

A      I believe it was [the defendant's] mother, but I'm not certain of that.

Q      And this would've been a conversation between Christina Sanchez and Alex, the boyfriend, while he was in jail at some point?

A      That's my understanding.  I . . . don't know whether it was while he was in jail or not, but that's my understanding.

Q      You have any idea how [the defendant's] mother came to be in possession of this tape?

A      I do not.

Rick Berry testified that he was an investigator for Inquisitor Incorporated and had investigated, on behalf of the defendant, the charges against him.  He said that the taped statement of the witness, Alex, was missing from his office.

The defendant testified that he was twenty-one years old at the time he entered the guilty pleas and had "made it to the ninth grade but didn't pass the ninth grade."  He explained the circumstances of his pleas of guilty:

A      Well, the week before . . . I entered the plea, . . . [co-counsel] and Rick [Berry] visit[ed] me, like, three or four times – numerous times during that week, which is . . . very uncommon, you know.

During those visits . . . they were trying to tell me that I needed to plead guilty, you know, they was just putting a lotta [sic] pressure on me.

And . . . I kept telling them, "No I don't wanna [sic] do this."

And, . . . they just kept telling me – I kept trying to bring up . . . of the expense or witnesses and they . . . just telling me that nothing's gonna [sic] work and that . . . they're just putting . . . a lotta [sic] pressure on me to plead guilty.

Q      Okay. Were you told, at some point in that time period, that the Court had denied additional funds for investigation in your case?

A      Yes, ma'am.

Q      Okay. Were you also told during that period that this potential witness, Alex, . . . was not to be found?

A      Well, they told me he was . . . dead; but then I found out from Mylene that he was not, that he was deported to Mexico. I could've got – I had a phone number.

Q      Okay. But were you told . . . did you believe that he would not be able to be found?

A      Yes, ma'am.

Q      Okay. And did you believe that there would be no more funding for an investigator to try to find him?

A      That's what they told me.

Q      Okay. Did you also believe, for whatever reason, that, even if you entered a plea, that you could get your . . . conviction set aside by claiming ineffective assistance of counsel?

A      Yes, ma'am. [Co-counsel] also told me that there was more . . . things that I could appeal but never went into detail in what they were.

Q      Okay. But, for whatever . . . I'm not talking about what people told you – did you in your mind believe that you could do that?

A      Yes, ma'am.

The defendant explained why he entered the pleas of guilty:

A      I just . . . all the pressure. One thing that was . . . not exactly accurate in the meetings the week before is . . . when I would tell them, "Yeah, I understand," like, "I should plead guilty," that was only to stop them from pressuring me.

        That's – if I tell them – they were telling me I need to plead guilty, I need to plead guilty.

        And I say, "No, I'm not going to."

-11-

They – it would keep on.  Only way for them to – you know I'm saying (sic) . . . the visits end and them to leave me alone was to say, "Yeah, okay, I'll think about it."

Q        Okay.  But what changed your mind on the thirty-first?

A        Well, when . . . I told them, "I don't wanna meet with Mylene,"[2] I told them, "I don't wanna plead guilty or nothing," they came –

THE COURT: (To the Witness) You didn't wanna meet with Mylene?

THE WITNESS:  No, because I didn't wanna feel obligated.

THE COURT:  Obligated for what?

THE WITNESS:  Well, they're doing me a favor by pleading guilty; I didn't wanna be obligated by having to go through with it.

THE COURT:  Well, how did you know what Mylene would say?

THE WITNESS:  Because . . . the morning I talked to her, she was crying and everything –

THE COURT:  Well, you didn't know that beforehand, though.

THE WITNESS:  No.

The defendant explained why he was affected by the fact that the victims' family was in court at the time of his pleas of guilty:

Q        When you came in, did you see people who were involved in the case or . . . who knew people involved in the case in the courtroom?

A        Are you talking about the victims' family?

Q        Uh-hum (affirmative).

A        Yes, ma'am.

Q        All right.  And how . . . did they appear in the courtroom?

---

[2]Mylene was the defendant's fiancée.

A       Very sad.  There's a few people crying. . . .  [O]ne woman was crying a lot.

Q       And how did that affect you?

A       Whew.  I mean, I can't even explain.  It . . . made me feel real bad, real sorry for the people.  And . . . they came all the way over here, for – you know –  having to hear everything what they did, was saying – and then for me to – I felt it would be wrong for me to . . . tell the Court that I did not wish to plead guilty.

## ANALYSIS

On appeal, the defendant argues that he should have been permitted to withdraw his pleas of guilty to prevent manifest injustice, in that they resulted from fear and misunderstanding and were not knowingly, understandingly, or voluntarily entered.  We will review these claims.

Tennessee Rule of Criminal Procedure 32(f)(1) provides that a trial court may grant a motion to withdraw a guilty plea "for any fair and just reason" before sentence is imposed, or to correct manifest injustice after the sentence is imposed but before the judgment becomes final.  Manifest injustice is present where (1) the plea was entered as a result of fear, fraud, or misunderstanding; (2) the State failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); (3) the plea was not knowingly, understandingly, and voluntarily entered; or (4) the defendant was denied the effective assistance of counsel in connection with entering the plea. State v. Crowe, 168 S.W.3d 731, 742 (Tenn. 2005).  Manifest injustice may exist in the absence of a constitutional violation, but where there is a denial of due process there is manifest injustice as a matter of law.  Id. at 742-43.  The decision whether to grant a motion to withdraw a plea of guilty rests with the sound discretion of the trial court and will not be reversed absent an abuse of discretion.  State v. Drake, 720 S.W.2d 798, 799 (Tenn. Crim. App. 1986).

In the motion to withdraw his pleas of guilty, the defendant alleged that:  (1) he realized "he was making a mistake but was intimidated by the process and fearful of incurring the wrath of the [c]ourt and/or the attorneys if he attempted to stop the pleas"; (2)  he did not "want to further upset [the victims' family members] by halting the plea hearing and advising the court that he did not want to enter the guilty pleas"; and (3) he did not believe "that he [was] criminally responsible for the deaths of the [victims]" because he acted "under duress and out of necessity to the extent that he participated and/or aided the co-defendant, Christina Sanchez, in the commission of the offenses."

In concluding that a manifest injustice would not result if the defendant were not allowed to withdraw his pleas of guilty, the trial court made lengthy findings:

It appears the defendant's claim is that he had always maintained he would not enter a plea in this case but was pressured to do so by the factors set out herein. He suggests that he signed the plea petition under pressure and sought [trial counsel] and his family as "outs" before he actually had to enter the plea.  However, when

-13-

[trial counsel] did not get the message and was not present for the plea and the defendant's family was not notified as requested by defendant, he was unable to be assertive and refuse to follow through on the plea. In fact, in his motion, he cites to the previous determination of his impairment in stressful situations.

As he cited in his motion and as testified at the hearing, the defendant said he felt intimidated by the process and at that point did not want to upset the victim[s'] family earlier. Even though he entered the plea, he soon thereafter knew he had done the wrong thing and sought to correct it via the instant motion.

Certainly, the testimony reflects a defendant facing some difficult decisions in light of facing felony murder charges and possibly the death penalty. The Court is perplexed that a defendant who was [as] calm and engaging as this defendant at the plea hearing can subsequently paint a completely different picture of the events leading up to the plea. It is almost inconceivable that a defendant with absolutely no desire to enter a plea would be able to participate in the plea colloquy (as evidenced by the transcript and DVD) without some indication of "coercion," "duress," or "threats."

Such a divergence forces the Court to weigh the present post-plea testimony against the conditions observed on the day of the plea and attempt to reconcile the two. Certainly, the evidence supports the defendant's position that he had maintained his stance of not pleading guilty throughout the pre-trial proceedings. Much of the testimony pointed to a change in the atmosphere as the trial (and jury selection) date approached. [Co-counsel] said the defendant asked him to pursue a possible plea. [Trial counsel] said he had no hint of a plea until he spoke with [co-counsel] at or near the time of the plea.

It is not clear from the testimony whether the defendant softened his stance on a possible plea when he faced the reality of the nearing trial date or if he truly had a subjective belief that he was being pressured into a plea agreement in his case. Counsel believed the defendant understood the charges against him and the consequences. They had also spoken to the defendant about the evidence and strength of the case. Though not necessarily a consideration at this stage, counsel testified that the outcome was a favorable one in light of the facts of this case.

While some of the testimony indicated significant hesitation on behalf of the defendant to enter a plea, the actual plea reflects a knowing, voluntary and intelligent plea. If the defendant felt the pressure of which he now speaks, he did not exhibit it at the plea colloquy. The Court cannot be clear if such pressure existed at the time of the plea's entry or was produced by a phenomenon similar to "buyer's remorse" as noted by [trial counsel]. The Court oftentimes has defendants enter pleas, e[s]pecially in serious cases, in close proximity to the trial date.

-14-

It is well settled that a defendant's mere change of heart about pleading guilty does not constitute manifest injustice warranting withdrawal. Crowe, 168 S.W.3d at 743. It is possible the defendant felt pressured to enter a plea before the upcoming jury trial. It is further possible the defendant attempted to communicate with [trial counsel] and his mother (and family) on the day of the plea to derail the plea he felt pressured to enter.

Here, the defendant has the burden of establishing manifest injustice. Here, the defendant has failed to meet that burden. The Court concludes the plea was intelligently, knowingly and voluntarily entered and was not the product of fear or fraud. Furthermore, the Court finds the plea was not the product of ignorance or misunderstanding or achieved through a denial of due process. Accordingly, the defendant's motion is denied.

As we will explain, we disagree with the defendant's argument, as did the trial court, that a "manifest injustice" will occur unless he is allowed to withdraw his pleas of guilty. We have set out a portion of the trial court's questioning of the defendant prior to the court's concluding that the defendant understood the process and that the pleas were "intelligently, knowingly and voluntarily entered." The transcript of the submission hearing shows that the defendant was questioned at length regarding the pleas. On appeal, he has not argued that the trial court was, in any fashion, deficient in advising him of the process or of his rights. Additionally, we note that the defendant has not directed this court to any portion of the transcript of the submission hearing evincing that he had any misunderstanding or hesitation regarding the pleas. Accordingly, we conclude that the record fully supports the finding of the trial court that the pleas of guilty were intelligently, knowingly, and voluntarily entered, were not the product of fear or misunderstanding, and to allow them to stand would not be a manifest injustice.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the trial court's order denying the motion to withdraw the pleas of guilty.

_____
ALAN E. GLENN, JUDGE

-15-